IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SHARON TALLEY<br>2144 Sanbur Drive<br>Fort Collins, CO 80526<br><br>               *Plaintiff*<br><br>v.<br><br>TOM VILSACK<br>Secretary, U.S. Department of Agriculture<br>1400 Independence Avenue, SW<br>Washington, D.C. 20250<br><br>               *Defendant*. | Case No. 8:23-cv-1520<br><br>Jury Trial Demand |

## COMPLAINT

Plaintiff Sharon Talley (hereinafter "Plaintiff Talley," "Dr. Talley," or "Plaintiff") by and through her attorneys, hereby files this Complaint against Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture (hereinafter "Defendant", "VA", or the "Agency"). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 791, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Talley.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e. Plaintiff filed an appeal with the MSPB which proceeded

1

to a hearing in 2022, and the Agency later issued a Final Agency Decision (FAD) and this complaint is being filed within 90 days of issuance of the FAD.

2. Plaintiff has exhausted all administrative remedies prior to filing suit.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions and employment decisions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4. Plaintiff Sharon Talley is a female (DOB 12/1970) and a resident of the State of Colorado. At all relevant times, Plaintiff Talley was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. and the Rehabilitation Act of 1973, 29 U.S.C. § 791,and the Age Discrimination in Employment Act, 29 U.S.C. § 633a

5. Defendant Tom Vilsack is the Secretary of the United States Department of Agriculture. The Department of Agriculture is an agency within the United States federal government and was an employer as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

## FACTS

6. Dr. Sharon Talley is biological scientist who was previously employed as the Team Lead, Regulatory Analyst for Western Compliance, GS-13 in APHIS. Dr. Talley's began employment with the Agency in 2007 and at the time, she was a single female without children. Her first and second level supervisors in 2012 were Dr. Douglas Grant, who worked in Colorado and Dr. Edward Jhee, who worked at the APHIS offices in Riverdale, Maryland.  Employment

actions taken against Dr. Talley were made in the Agency's Beltsville, Maryland office or approved by Agency employees in the Agency's Riverdale, Maryland office.

7. Dr. Talley suffers from a number of medical conditions, including degenerative disc disease, sacroiliac joint dysfunction, fibromyalgia, and myofascial pain syndrome.

8. In April 2012, Dr. Talley complained during a performance review about a lack of opportunities and that Jeffrey Beaman, a male co-worker, received first consideration for assignments. Mr. Grant gave Mr. Beaman career enhancing employment opportunities and when Dr. Talley complained, Mr. Grant said Mr. Beaman was senior and would receive all opportunities first and if he did not want them, then Dr. Talley could have a chance at the opportunities. Dr. Talley did the same work as Mr. Beaman, but he received first choice with the assignments. For example, in early 2012, there was training in Fresno, California. Dr. Talley offered to help present the training because she had studied the compliance materials thoroughly and was looking for opportunities to work. Mr. Grant decided that Dr. Talley would present remotely and that he and Dasha Sanchez and Mr. Beaman would attend the training event in person.

9. Dr. Talley also raised concerns about harassment in the office. Specifically, that she was confronted by Dasha Sanchez, a female administrative assistant in the office, and questioned about whether she was romantically interested in Douglas Grant. In 2012, Mr. Grant was going through a divorce and became romantically involved with Ms. Sanchez and later married her. Ms. Sanchez also worked with another employee to attempt to get Dr. Talley terminated. Dr. Talley later escalated the complaint in writing in June 2012 to Dr. Grant. Dr. Talley spoke to Mr. Grant in June 2012 about harassment by Mr. Beaman and Ms. Sanchez. Dr. Talley thereafter engaged the Agency's ADR office, and she was informed by ADR that she should write an email to Ms. Sanchez and let her know to stop asking her questions about whether Dr.

Talley was interested in Douglas Grant. Dr. Talley was told by Dr. Grant and Dr. Jhee that she was not allowed to discuss issues with any employee and that she should go to the employee's supervisor. ADR later referred Dr. Talley to the Agency's workplace violence coordinator and Dr. Talley filed a workplace violence report. Soon after Dr. Talley made her complaint, she became the subject of an APHIS security complaint by an employee who had recently arrived in Ft. Collins from the Riverdale, Maryland office, Andrea Marks. Dr. Talley later learned from Ms. Marks that Ms. Sanchez had recruited her to help in an attempt to harass Dr. Talley and get her terminated.

10. Dr. Talley also received from Mr. Beaman what she perceived to be a threat on her life. On June 11, 2012, Dr. Talley informed Mr. Beaman that she was going to inquire about a desk audit. Mr. Beaman stated that a desk audit could cause both of them to get downgrades and he stated, "I will kill anyone who threatens me or my family." Dr. Talley was shocked by his comments and responded that she was not threatening him or his family but simply promoting herself. Mr. Beaman then asserted that Dr. Talley was "playing the woman card" and that her degree was "only a piece of paper." Dr. Talley's comment about requesting a desk audit was simply to demonstrate that they were completing the same job, but she was being paid less. Mr. Beaman later issued an apology to Dr. Talley, but Dr. Talley reported the threat to the Agency and no action was taken.

11. In mid-June 2012, Dr. Talley reported to her second level supervisor Edward Jhee in Riverdale, Maryland about the abuse and harassment she witnessed and experienced through her first level supervisor Douglas Grant's and co-worker Dasha Sanchez's behavior. Mr. Jhee later traveled to Colorado and interviewed Dr. Talley, and Mr. Grant was removed from supervision of Ms. Sanchez, but they continued to work in the same location for a number of months.

12. In July 2012, after the Agency failed to address Dr. Talley's concerns despite her prior disclosures, Dr. Talley disclosed to the workplace violence program and APHIS security about the lack of opportunities she faced and her previous report of workplace waste, abuse of authority, and harassment.

13. In July 2013, Dr. Talley filed an anonymous OIG complaint regarding Douglas Grant's behavior. In July 2013, Dr. Talley filed an OIG complaint about Dr. Jhee's knowledge of the ongoing affair between her supervisor and the administrative assistant.  She complained that Dr. Grant's behavior and inappropriate relations with his two other employees created a hostile work environment.  Dr. Talley was later harassed by William Anderson, a friend of Ms. Sanchez.

14. From June 2012 until the beginning of 2020, Douglas Grant continually denied Dr. Talley's requests to attend paid ESRI GIS training seminars. Dr. Talley submitted these requests for GIS training in her Individual Development Plans ("IDP") through the "AgLearn" database. Dr. Talley and Mr. Grant also discussed Dr. Talley's request and interest for training at performance reviews and at one-on-one meetings. Mr. Grant would often tell Dr. Talley that they had no funding for the training and asked her to request training at the end of the year when the desired training courses were unavailable. Despite this, Sarah Allely, a coworker of Dr. Talley's was given the GIS training that Dr. Talley requested but was denied. Dr. Talley brought this concern forward to Mr. Grant and Mr. Grant expressed to Dr. Talley that she was "lucky" to have the job and blamed her for involving others in office drama. Dr. Talley also inquired with ESRI and received email notices when training was available but was not awarded that training until the end of 2019.

15. In 2013 and early 2014, Douglas Grant announced that the branch was expanding and would be hiring new staff. Mr. Grant said that the branch would be adding a GS-13 Compliance Specialist Position and that Jeffrey Beaman, and Dr. Talley should apply if they were interested. Dr. Talley was excited for the opportunity and repeatedly told Mr. Grant that she was interested in applying for the position and that she planned to apply for it. Edward Jhee was also aware of Dr. Talley's continued interest in applying as it had come up during conversations between them.

16. In April 2014, the GS-13 Specialist Compliance position opened on USAJobs. Dr. Talley was disappointed to see that the job posting was only open to the Portland, Oregon area and was only open for seven days.

17. Between 2013 and 2015, Dr. Beaman was vacant from the office and Dr. Talley was required to carry the workload of Dr. Beaman. In April 2014, Dr. Talley again expressed her interest in applying for the GS-13 position to Mr. Grant, despite its location Portland, Oregon and could move to Oregon for the promotion. Dr. Talley was already performing the basic work duties for the GS-13 position and believe she had a competitive chance for the position. Instead, Mr. Grant told Dr. Talley not to apply to the position because he and Mike Firko, BRS deputy administrator, had someone else in mind to fill the position – Mr. Gary Brown, a PPQ officer located in Portland, Oregon. Dr. Grant told Dr. Talley that there would be other opportunities for her in the future, and that she could not be considered for the Portland GS-13 position because she was not physically located in the Portland commuting area. Dr. Grant discouraged Dr. Talley from applying for the position, and Dr. Talley felt that her current position would be in jeopardy if she applied for the Compliance Specialist position. Since Dr. Grant was likely the selecting official with Edward Jhee's and Mr. Firko's wanting to hire Mr. Brown, Dr. Talley did not want to

challenge them by applying for the position and escalate the harassment she was already experienced in the office that she previously disclosed.

18.     On August 25, 2014, Dr. Grant sent an email announcing that Gary Brown was hired for the Compliance Specialist Position in Portland. Mr. Brown was not more qualified than Dr. Talley to be the Compliance Specialist and Mr. Brown's position, GS-13, was not much different than Dr. Talley's position at a GS-12. There were no valid reasons that the position was open in the Portland, Oregon. At the time, BRS issued anywhere from 500 to 800 inspections a year and the number of compliance inspections varied from state to state. The states with the highest number of compliance inspections were in the Western U.S.: Hawaii, Texas, Kansas, Iowa, California, and Nebraska. Oregon had few compliance inspections comparatively, and the drive time to Washington and other nearby states was very long. Mr. Brown only conducted approximately one inspection in Oregon in 2019, approximately three inspections in Oregon in 2018, approximately five inspections in Oregon in 2017, approximately seven inspections in Oregon in 2016, approximately twelve inspections in Oregon in 2015, approximately one inspection in Oregon in 2014. Before Mr. Brown was hired by BRS, he conducted inspections for Dr. Talley's branch through a MOU with their sister program, PPQ. In 2013, Mr. Brown conducted approximately three inspections for BRS as a PPQ inspector. As far as compliance incidents were concerned, the branch had had several notable incidents that required emergency response: at least two in the state of Washington, one in Montana, and one possibly in Oregon. The branch had compliance agreements in other states including Oregon and Dr. Talley believed that the position was created in Portland, Oregon to hire Mr. Brown and to obstruct Dr. Talley from applying for it. Mr. Brown verbally told Dr. Talley when they travelled together in California that he was pre-

selected for the GS-13 Compliance Specialist Position and that he was communicating with Mr. Firko, Mr. Grant, and Mr. Jhee prior to them announcing the position there.

19. In June-July 2019, Dr. Talley expressed continued interest in applying for the GS-14 Acting Western Compliance Branch Chief ("WCBC") and informed Dr. Grant and Dr. Jhee of her interest.

20. On June 5, 2019, Dr. Talley sent an email to Dr. Grant reiterating that she was interested in the acting position when Dr. Grant went to Riverdale, Maryland to take the acting Communications Branch Chief Position in July 2019. Dr. Grant said that Dr. Jhee would be the selecting official and Dr. Talley reached out to Dr. Jhee by phone.

21. In July 2019, despite Dr. Talley's expressed interest, the GS-14 Acting WCBC position was never announced for competition, and was later given to Gary Brown out of the Portland, Oregon office. While Mr. Brown was Dr. Talley's acting branch chief, Dr. Talley did discuss his temporary promotion with him. Mr. Brown told Dr. Talley that she should not complain about not being able to compete for the position and said that Dr. Jhee called him and offered the position to him and because he wanted to retire at end of 2019 and that he "could use the extra money." Mr. Brown also told Dr. Talley that his first attempt with his resume failed, and that Dr. Talley needed to correct her own resume and sent her a copy of his new resume. Mr. Brown said that Dr. Talley was "lucky" to get the acting temporary position in 2017 when Mr. Grant went on paternity leave in 2017. Mr. Brown also told Dr. Talley that she got the less than 30-day promotion because he had initially turned it down and that Ms. Allely was going to Alaska for State Plant Health Directors meeting and a cruise and also passed on the opportunity before it was offered to Dr. Talley.

22. In March 2020, Douglas Grant and Edward Jhee reassigned a small pilot project that Dr. Talley created, led, and worked on throughout 2019 to Heather Brown. Ms. Brown held a Kickoff Meeting and called Dr. Talley prior to this meeting to apologize that Douglas Grant and her supervisor, Nathaniel Yates, had made her the new team leader of the pilot project, that the project was being renamed turning it into the Compliance Oversight Project, and that Dr. Talley would no longer be the team leader. Ms. Brown expressed her apologies to Dr. Talley and said that it was out of her control and admitted it was not fair to Dr. Talley. Christana Gouin, another coworker, was also on the project and observed the reassignment. Ms. Gouin and Dr. Talley later discussed the reassignment a few times as a type of retaliation from Dr. Talley's whistleblowing as it was well known that Dr. Grant was trying to punish Dr. Talley

23. There was no prior notice of the reassignment by Dr. Grant, and Dr. Jhee had left BRS for another position. Dr. Talley only learned about the reassignment through Heather Brown's phone call prior to the meeting. Despite being assigned to Dr. Talley's pilot project of satellite imagery; Ms. Brown was not able to contribute much to the project, and in 2020, and with very last-minute end-of-year funds, Dr. Talley was able to secure the satellite contracts herself for the project's continuation. Ms. Brown did not contribute much to the project until Mr. Mason requested work from the team. When Dr. Talley asked Ms. Brown for help, she accused her that she was just trying to use up the funds in the contracts Ms. Gouin was part of the email chain communication.

24. From June 8, 2020- August 1, 2020, Dr. Talley served as Acting WCAB Branch Chief. Her duties and accomplishments included mitigating unforeseen inspection challenges such as travel restrictions during the COVID-19 pandemic, updating inspection worksheets, getting ready for in person inspections in case we could travel, engaging CEEB and PPQ to help with

9

workload, identifying timely follow-up inspections, and clustered inspections with the same cooperator to increase efficiency. As a result of Dr. Talley's efforts, ROP met inspection and compliance goals. Dr. Talley was also tasked to find the best satellite imagery solutions to meet ROP needs and assessed primary and third-party satellite imagery vendors, developed a creative solution, created contract criteria, and secured contracts with two imagery providers. On her own initiative, Dr. Talley directed two RAs to preserve their unique knowledge by creating a shared folder for them to document how they conducted facility and equipment inspections. Dr. Talley also led the development of a field inspection Health and Safety document and provided links to the latest guidance from Centers for Disease Control and Prevention ("CDC").

25. Despite Dr. Talley's duties and accomplishments, Dr. Talley did not receive a salary increase nor was she issued a SF50 for a temporary promotion to acting WCAB Branch Chief. An increase in salary has a substantial financial impact on a federal employee's retirement. When an award is given in lieu of the salary increase, the award is not taken into consideration. Dr. Grant awarded Philip Mason multiple temporary Branch chief positions, while denying the same opportunities to Dr. Talley, and this gave Dr. Mason an advantage over Dr. Talley when applying for the permanent position.  Dr. Talley filed a timely EEO complaint after she was not selected for the WCAB Branch Chief position.   Dr. Talley had no relief from her team lead duties as a GS-13 and did both positions very well. Dr. Talley believed that she successfully accomplished more than anyone else appointed to the position in her 60-day appointment.

26. Dr. Talley suffers from a number of painful medical conditions, including fibromyalgia and myofascial pain syndrome, a degenerative disc disease.  Dr. Talley often has painful sciatica down her legs from sitting or bending over to pick up things or even tie her shoes. She is under the care of a pain management specialist and other doctors. Her condition makes it

very painful to sit or stand for lengthy periods of time. She also suffers from Post Traumatic Stress Disorder (PTSD) and has been seeing mental health professionals since harassment at work escalated in June 2012.

27.     Dr. Talley began making requests for reasonable accommodation in May 2016. At the time, she was unsure if her condition was permanent. As an accommodation, she was given a lightweight computer with touchscreen. Dr. Talley made a formal request to the Agency for reasonable accommodation in July 2018. In 2018, the office worked a maxiflex schedule. Dr. Talley was informed that she could telework three days a week and work in the office two day a week. Dr. Talley was discouraged from taking Fridays off, even though a longer weekend helped her recover and commuting to the office caused her intense pain. Dr. Talley was the only staff member in the office on Friday, so it did not make sense to require her to be physically present in the office. Dr. Talley was denied permanent telework status while several other employees without reasonable accommodation were granted permanent telework status.

28.     In January 2021, Dr. Talley requested a reasonable accommodation request with her supervisor, Philip Mason. Mr. Mason issued his decision on her reasonable accommodation request on February 28, 2021. He did not grant her primary requested accommodation to be placed on permanent telework status. He said he would revisit the reasonable accommodation request when the Agency ordered the staff back into the office on October 1, 2021. Permanent telework would have required an official change of duty station which he denied. Dr. Talley took disability retirement in 2022 because she felt that she was being squeezed out of her job by the Agency changing her performance plan and requiring that she have more sedentary and undesirable work; leaving her out of mandatory meetings by leaving her off the meeting notices and invites; and

changing her performance plan. After the Agency failed to advise her of her FMLA rights in early 2021, Dr. Talley .

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e *et seq.*

29. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

30. At all pertinent times, Defendant was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

31. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

32. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to er compensation, term, conditions, or privileges of employment, because of such individual's color, religion, sex, age, national origin, or to limit, segregate, or classify employees or applicants for employment opportunities or otherwise adversely affect her status as an employee, because of the individual's race, color, religion, sex, age, or national origin

33. Defendant, in violation of Title VII of the Civil Rights Act of 1964, subjected Plaintiff to discrimination based on her sex by creating a hostile work environment and subjecting her to disparate treatment. Plaintiff's supervisor in 2012, Douglas Grant, subjected Plaintiff Talley to a hostile work environment and disparate treatment by offering preferential work assignments to Jeffrey Beaman; allowing Beaman to threaten to kill Plaintiff without consequences; allowing

Dasha Sanchez to harass Plaintiff about whether she was interested romantically in Douglas Grant; blaming Plaintiff for conflict in the office; denying training to Plaintiff; yelling at her and including false information on her performance review in 2017 and 2018; denying selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions; failing to provide Plaintiff with a salary increase when she was a given a temporary promotion to Acting WCAB Branch Chief and update Plaintiff's SF 50 to reflect a promotion detail; denying Plaintiff's request for reasonable accommodation in 2021 and failing to advise Plaintiff of her FMLA rights in February 2021. Plaintiff was treated differently than her male colleagues, including Jeffrey Beaman and Gary Brown. The reasons given for Plaintiff's non selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions are false and the Agency did not follow its normal policies in filling the vacancies.

34.     As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress, pain and suffering, humiliation, and embarrassment.

35.     Defendant had no legitimate business reason for any such acts.

36.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II

### Violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791

37.     Plaintiff realleges and incorporates by reference each of the allegations in the paragraphs above as if set forth fully herein.

38.     At all pertinent times, Defendant Vilsack, in his official capacity as the Secretary of the USDA, was an employer under and subject to provisions of the Rehabilitation Act of 1973,

29 U.S.C. § 791.

39. At all pertinent times, Plaintiff was an employee entitled to protection under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791.

40. Section 501 of the Rehabilitation Act prohibits federal executive branch agencies from discriminating against qualified individuals with disabilities and requires executive branch agencies to take affirmative action in the hiring, placing, and advancing of individuals with disabilities, and requires interpretation consistent with the Americans with Disabilities Act. 29 C.F.R. § 1630.9(a) makes it unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business. 29 C.F.R. § 1614.203(c) further requires that the federal government be a "model employer" of individuals with disabilities.

41. Defendant USDA has engaged in illegal disability discrimination, as defined by the Rehabilitation Act failing to provide reasonable accommodation for Dr. Talley's disability by allowing her permanent telework and requiring her to come into the office of Friday.

42. Defendant had no legitimate business reason for any such acts. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory and/or retaliatory practices that are not yet fully known.

## COUNT III

**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e** *et seq.*
*Retaliation*

43. Plaintiff incorporates by reference paragraphs 1 through 42 as if fully stated herein.

44.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual filed a complaint of discrimination.

45.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

46.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

47.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, Defendant knowingly and intentionally subjected Plaintiff to retaliation and created a hostile work environment because she filed complaints of discrimination beginning in June 2012.  The retaliation included, blaming Plaintiff for conflict in the office;  denying training to Plaintiff; yelling at Plaintiff and including false information on her performance review in 2017 and 2018; denying selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions; failing to provide Plaintiff with a salary increase when she was a given a temporary promotion to Acting WCAB Branch Chief and update Plaintiff's SF 50 to reflect a promotion detail; denying Plaintiff's request for reasonable accommodation in 2021 and failing to advise Plaintiff of her FMLA rights in February 2021.  Plaintiff was treated differently than her colleagues who had not engaged in protected activity.

**<u>Count IV</u>**

**Violation of the Age Discrimination in Employment Act**
**29  U.S.C. § 633a**
*Age Discrimination*

48.     Plaintiff incorporates by reference paragraphs 1 through 36 as if fully stated herein.

49.     The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age.

50.     At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

51.     At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

52.     In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to discrimination and created a hostile work environment because of her age.  Dr. Talley was targeted because of her age by her supervisor, Douglas Grant.  Two of Plaintiff's female coworkers were considerably younger than Plaintiff and they received almost all of the opportunities for promotions, training, education and assignments on committees. One of younger female co-workers was Sarah Alley and she received multiple promotions, awards and career enhancing assignments.   Dr. Grant demonstrated his preference for working with the younger female employees over Dr. Talley.  He made demeaning comments to Dr. Talley during meetings, and when he met with her he would constantly be preoccupied with instant messaging and would turn his back to her,  but gave his full attention to the younger female employees when he interacted with them

53.     As a result of such acts, Plaintiff has suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Talley prays as follows:

A.   That the Court issue an order declaring Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. § 791, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a and declaring Plaintiff eligible to receive equitable and other relief;

B.   That the Court enter judgment against Defendant and award damages no less than $5,000,000 (Five Million Dollars);

C.   That the Court issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.   That the Court enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law;

E.   That the Court order Defendant to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.   That the Court order Defendant, individually and collectively, to pay compensatory damages;

G.   That the Court order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees, and costs; and

H.   That the Court order Defendant to pay pre-judgment and post-judgment interest as provided by law.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims against Defendant.

Date: June 5, 2023                          Respectfully submitted,

                                                 */s/ David A. Branch*
                                      David A. Branch, Esq.
                                      #22862
                                      Law Office of David A. Branch
                                      & Associates, PLLC
                                      1828 L Street N.W., Suite 820
                                      Washington, D.C. 20036
                                      Phone: (202) 785-2805
                                      Fax: (202) 785-0289
                                      Email: davidbranch@dbranchlaw.com