## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **SHARON TALLEY** )  |  |
| ) | |
| *Plaintiff* ) | **Case No. 8:23-cv-01520-DLB** |
| ) | |
| **v.** ) | **Jury Trial Demand** |
| ) | |
| **TOM VILSACK** ) | |
| **Secretary, U.S. Department of Agriculture** ) | |
| ) | |
| *Defendant.* ) | |

## AMENDED COMPLAINT

Plaintiff Sharon Talley ("Plaintiff Talley," "Dr. Talley," or "Plaintiff") by and through her attorneys, hereby files this Amended Complaint against Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture ("Defendant", "USDA", or the "Agency").

Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Rehabilitation Act of 1973, 29 U.S.C. § 791 ("Rehabilitation Act"); and the Age Discrimination in Employment Act, 29 U.S.C. § 633a ("Age Discrimination Act"); and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Talley.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e. Plaintiff filed an appeal with the U.S. Merit Systems

1

Protection Board ("MSPB") which proceeded to a hearing in 2022, and the Agency later issued a Final Agency Decision ("FAD") and this complaint is being filed within 90 days of issuance of the FAD.

2.      Plaintiff has exhausted all administrative remedies prior to filing suit.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions and employment decisions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4.      Plaintiff Sharon Talley is a fifty-two-year-old female and a resident of the State of Colorado. At all relevant times, Plaintiff Talley was an employee entitled to protection under Title VII, the Rehabilitation Act, and the Age Discrimination Act.

5.      Defendant Tom Vilsack is the Secretary of the United States Department of Agriculture. The Department of Agriculture is an agency within the United States federal government and was an employer as defined by Title VII, the Rehabilitation Act, and the Age Discrimination Act.

## FACTS

6.      Dr. Sharon Talley is a biological scientist who was previously employed as the Team Lead, Regulatory Analyst for Western Compliance, GS-13 in the Animal & Plant Health Inspection Service ("APHIS"). Dr. Talley's began employment with the Agency in 2007 and at the time, she was a single female without children. Her first and second level supervisors in 2012 were Dr. Douglas Grant, who worked in Colorado and Dr. Edward Jhee, who worked at the APHIS offices in Riverdale, Maryland. Dr. Philip Mason also later became Dr. Talley's supervisor. The

employment actions taken against Dr. Talley were made in the Agency's Beltsville, Maryland office or approved by Agency employees in the Agency's Riverdale, Maryland office.

7.       Dr. Talley suffers from a number of painful medical conditions, including fibromyalgia and myofascial pain syndrome, a degenerative disc disease, and sacroiliac joint dysfunction. Dr. Talley often has painful sciatica down her legs from sitting or bending over to pick up things or even tie her shoes. She is under the care of a pain management specialist and other doctors and her condition makes it very painful for her to sit or stand for lengthy periods of time. Dr. Talley also suffers from Post Traumatic Stress Disorder ("PTSD") and has been seeing mental health professionals since harassment at work escalated in June 2012.

8.       Dr. Talley was assigned work that her male colleague, Jeffrey Beaman, refused to do. For example, she was assigned to audit the sugar beet reregulation audits, when Mr. Beaman refused this assignment in March 2012.  Dr. Grant further provided virtually no training to Dr. Talley and very little direction and required Mr. Beaman to be the go-between with him and her. In April 2012, Dr. Talley complained during a performance review about a lack of opportunities and that Mr. Beaman received first consideration for assignments. Dr. Grant gave Mr. Beaman career enhancing employment opportunities and when Dr. Talley complained, Dr. Grant responded that Mr. Beaman was senior and would receive all opportunities first and if he did not want them, then Dr. Talley could have a chance at the opportunities. Despite the fact that Dr. Talley did the same work as Mr. Beaman, Mr. Beaman received first choice on assignments. For example, in early 2012, there was training scheduled in Fresno, California and Dr. Talley offered to help present the training because she had studied the compliance materials thoroughly and was looking for opportunities to work. Dr. Grant instead decided that Dr. Talley would present remotely and that he, female administrative assistant Dasha Sanchez, and Mr. Beaman would attend the training

event in person. Another example included when Mr. Beaman worked on an directed inspection of a greenhouse in California. Ms. Sanchez received the first pick of new cubes, followed by Mr. Beaman, and then, lastly, Dr. Talley. Dr. Talley was often excluded from work projects as well.

9.      Dr. Talley also raised concerns about harassment in the office. Specifically, she raised concerns that she was confronted by Ms. Sanchez, and was questioned about whether she, Dr. Talley, was romantically interested in Dr. Grant. In 2012, Dr. Grant was going through a divorce and became romantically involved with Ms. Sanchez and later married Ms. Sanchez. Ms. Sanchez also worked with another employee to attempt to get Dr. Talley terminated. Dr. Talley later escalated the complaint in writing to Dr. Grant in June 2012.

10.      In May 2012, Dr. Talley was asked to act in Dr. Grant's role because he was on a special assignment in Colorado Springs, Colorado, but Dr. Grant failed to provide notice to the office that Dr. Talley was working in an acting capacity that date.

11.      In June 2012, Dr. Talley spoke to Dr. Grant about harassment by Mr. Beaman and Ms. Sanchez and Dr. Talley thereafter engaged the Agency's alternative dispute resolution ("ADR") office. Dr. Talley was informed by ADR that she should write an email to Ms. Sanchez to request that she stop asking questions about whether Dr. Talley was romantically interested in Dr. Grant. Dr. Talley was told by Dr. Grant and Dr. Jhee that she was not allowed to discuss issues with any employee and that she should go to the employee's supervisor. ADR later referred Dr. Talley to the Agency's workplace violence coordinator and Dr. Talley filed a workplace violence report.

12.      Soon after Dr. Talley made her complaint, she became the subject of an APHIS security complaint by Andrea Marks, an employee who had recently arrived in Ft. Collins from

the Riverdale, Maryland office. Dr. Talley later learned from Ms. Marks that Ms. Sanchez had recruited her to help in an attempt to harass Dr. Talley and cause her termination from employment.

13.     On June 8, 2012, Dr. Talley complained to Dr. Grant that he was providing choice work assignments to Dr. Talley's male colleague. That same day, Dr. Grant gave a new choice work assignment to Mr. Beaman for Oregon.

14.     On June 11, 2012, Dr. Talley received a threat on her life by Mr. Beaman. Dr. Talley informed Mr. Beaman that she was going to inquire about a desk audit. In response, Mr. Beaman stated that a desk audit could cause both of them to get downgrades and stated, "I will kill anyone who threatens me or my family." Dr. Talley was shocked by his comments and responded that she was not threatening him or his family but simply promoting herself. Mr. Beaman then asserted that Dr. Talley was "playing the woman card" and that her degree was "only a piece of paper." Dr. Talley's comment about requesting a desk audit was simply to demonstrate that they were completing the same job, but she was being paid less. Mr. Beaman later issued an apology to Dr. Talley. Dr. Talley reported the threat and incident to the Agency but no action was taken. Dr. Talley genuinely feared for her life because she had reason to believe that Mr. Beaman had a criminal history.

15.     On June 13, 2012, Dr. Talley spoke in person to Dr. Grant, and she noticed that Ms. Sanchez attempted to call Dr. Grant while she was meeting with him, and then Ms. Sanchez paced back and forth in front of Dr. Grant's office and appeared very upset and gave Dr. Talley a "dirty" look.

16.     On or around June 18, 2012, Dr. Talley contacted Dr. Jhee regarding the continued workplace misconduct was given false information regarding how to report workplace harassment by Dr. Jhee who advised that she must go directly to said employee's supervisor to report the

issues. Dr. Talley requested the employee handbook and was later sent a link to the Agency's Employee Responsibilities and Conduct, which stated that Dr. Talley could report her issues to "office of the inspector, general, the impact, Employee, Supervisor, or any appropriate USD USDA management official…..[to report] 1. Fraud waste and abuse of government resources, 2. Criminal activity of any kind, 3. Violations of federal personnel, sexual-harassment,… [and] 5. Prohibited personnel practices,…" Later that day, Dr. Talley met with Eric Nickerson, one of the Agency's head branch chiefs of APHIS Investigative and Enforcement Services, who informed Dr. Talley to advise ADR of her complaints a soon as possible.

17.     On June 19, 2012, following Nickerson's advice, Dr. Talley called and left a message with ADR Special Mediation Specialist Ray Jones and ADR Ms. Farms. Dr. Talley also communicated with Johnny Capehart, investigator with workplace violence program.

18.     On June 21, 2012, Dr. Talley filed a report with WPVP and sent an email to Dr. Grant advising him of her report. Dr. Grant continued to fail to take appropriate action on her complaints including for sexual harassment.

19.     From June 27 through October 2012, Dr. Talley began meeting with APHIS security. For example, on June 27, 2012, from 1:30 p.m. to 3:40 p.m., Dr. Talley met with Mr. Olms of APHIS security and during the meeting, Mr. Olms' advised Dr. Talley that Ms. Mark had stated that Dr. Talley was "emotionally unstable." The false allegation failed to include the fact that Ms. Marks was the one who had used profanity and yelled during prior engagements, and Dr. Talley had reason to believe that Ms. Marks had initiated a false sexual harassment complaint against her.

20.     On June 28, 2012, Dr. Talley was subjected to obnoxious and loud phone conversion by Ms. Marks which disrupted Dr. Talley's work and further added to the hostile work

environment. Within clear earshot of Dr. Talley, and with clear intent for Dr. Talley to overhear as she was the only other person that was in the office, Ms. Marks engaged if loud phone conversation which included loud laughter and profane language such being "pissed", "peace out", and "you have a nice body" and that she would seek employment with private industry after she retires. Ms. Sanchez later met with Ms. Marks, and they left the office together and when they came back, again engaged in loud conversation which included statements regarding promotion, such as "God, I love Step Increases." Before leaving the office, advised Ms. Sanches that she would "see [her] tonight."

21.     In mid-June 2012, Dr. Talley reported to Dr. Jhee in Riverdale, Maryland about the abuse and harassment she witnessed and experienced through Dr. Grant's and Ms. Sanchez's behavior. Dr. Jhee later traveled to Colorado and interviewed Dr. Talley, and Dr. Grant was removed from supervision of Ms. Sanchez, but they continued to work in the same location for a number of months.

22.     On June 29, 2012, from 1:00 p.m. - 3:00 p.m., Dr. Talley attended an in-person RFP meeting whose attendees included Ms. Marks, Ms. Sanchez, Mr. Beaman, and Dr. Grant. During the meeting, Ms. Marks spoke aggressively and continued to use foul language directed at Dr. Talley. One example included discussing merging inspections and audits in which Ms. Marks said they would be "knee-deep in shit." When Dr. Grant would engage in conversation, however, Ms. Marks would agree and reply that he "makes [her] heart go pitter patter." Dr. Talley later advised Mr. Olms of the foul language directed at her during the meeting and complained to him that she believed Ms. Marks was aggressive towards her and did not want to be alone in the workplace with her. Dr. Talley also sent a message to Dr. Grant advising him that Ms. Marks had interrupted her during the meeting by yelling her name across the room and that Ms. Marks she yells at her

and said that she was "not ready to address elephants in the room." Dr. Talley also advised Ms. Marks personally that she did not want to speak with her alone without another person present.

23.     In July 2012, after the Agency failed to address Dr. Talley's concerns despite her prior disclosures, Dr. Talley disclosed to the Agency's workplace violence program and APHIS security about the lack of opportunities and her previous report of workplace waste, abuse of authority, and harassment.

24.     On July 6, 2012, despite the Agency's heavy workload, Dr. Talley was given no work assignments.

25.     On July 9, 2012, despite the Agency's heavy workload, Dr. Talley was given no work assignments.

26.     On July 26, 2012, Mr. Beaman designated Dr. Wendy Jin, in his acting position. Mr. Beaman again passed on Dr. Talley for an opportunity and when Dr. Talley was designated to run the branch when Dr. Grant and Mr. Beaman were not available.

27.     On July 30, 2012, Dr. Talley was again subjected to hostile behavior from Mr. Beaman. When Dr. Talley approached him about her work to ask if she was supposed to send a report back for missing titles, Mr. Beaman unkindly responded "yes." When Dr. Talley followed up and asked if she could delete an attachment and he barked back "I don't know!" Dr. Talley felt intimidated and felt that she could not approach him. Dr. Talley continued to feel that she was part of a hostile and offensive work environment.

28.     On August 23, 2012, Dr. Grant designated Dr. Wendy Jin, in Dr. Beaman's acting position when Mr. Beaman was out sick, again passing on Dr. Talley for an opportunity and when Dr. Talley was designated to run the branch when Dr. Grant and Mr. Beaman were not available. Dr. Talley reached out to Mr. Beaman to ask for Dr. Jin's contact information and Mr. Beaman

replied that he had planned on acting and did not provide Dr. Talley with Dr. Jin's contact information again unreasonably interfering with Dr. Talley's work.

29.     On September 21, 2012, Dr. Grant issued Dr. Talley a performance rating which failed to consider her work in two elements: teamwork and EEO. With respect to EEO, Dr. Talley was met with challenge in attempting to participate in her EEO assignments such as being denied work on a civil rights committee as a special emphasis program manager by Dr. Grant and Dr. Jhee not allowing her to work on Brs EEOAC despite openings for work. Dr. Talley also showed exemplary teamwork by addressing problems in the office such as working on teams for Roundup, sugarbeet inspection, contributing in a substantial manner to all teams, and giving last-minute presentations when Mr. Beaman or Dr. Grant were unable. Dr. Talley should have otherwise been eligible for a performance award but was given an unfair opportunities and then an unfair evaluation.

30.     On October 1, 2012, Dr. Talley was told by instructor, Marilyn Miller, that she must get the support of a team member, Ms. Marks, before talking to coworkers as it could be considered mobbing and bullying. Specifically, Ms. Miller advised Dr. Talley to "just do it" and "don't whine."

31.     On October 18, 2012, Mr. Beaman gave Dr. Talley "angry looks"; did not response to Dr. Talley when she said hello to him; kept his back to Dr. Talley; and was gone for large portions of the day.

32.     On October 24, 2012, Mr. Beaman again came into the office and did not acknowledge Dr. Talley, including during a staff meeting when she spoke. This is despite the fact that Dr. Talley observed Mr. Beaman acting friendly towards others, causing difficulty in small group work. Dr. Talley raised this concern with Dr. Grant and told him that Mr. Beaman was avoiding her and was being disrespectful. Dr. Grant acknowledged Mr. Beaman's avoidance of Dr.

Talley and advised that he would speak with Mr. Beaman. They also discussed a prior indicent in which Dr. Jhee brought Dr. Talley into a conference room to have Ms. Marks yell at her and that she may have to bring the issue to the attention of Human Resources. Dr. Grant advised against this stating that  it "wouldn't do any good because all the complaints go to your first line supervisor and then sometimes your second."

33.     In fall 2012 Dr. Talley files an APHIS security sworn complaint and waits for changes to be made in the office, but there was none made.

34.     Throughout 2012-2013, Dr. Talley observed a number of instances in which her coworkers were allowed to telework; ignored her presence in the office complete despite her attempts to communicate in a friendly manner; and seemingly only worked sparse hours in-office, sometimes gone for the entire day, when she was otherwise required to work in-office.

35.     In or around February- March 2013, Ms. Allely hired as a GS-9 Step 8 and worked with Mr. Beaman. Mr. Beaman and Ms. Allely, however, kept their backs to Dr. Talley and failed to acknowledge Dr. Talley in the workplace. Despite the small team size, Dr. Talley was excluded from the hiring process, a customary practice for high-level scientists across APHIS.

36.     In or around February - March 2013, Ms. Marks confessed to Dr. Talley while they were on travel to St. Louis together, that she conspired with Ms. Sanchez in an attempt to cause Dr. Talley's termination from employment.

37.     From March through July 2013, Mr. Beaman continued to act in a variety of ways to make Dr. Talley's work life difficult such as ignoring her and keeping her out of projects, making her work environment almost impossible. Additionally, Mr. Anderson joins the work group with the help of Ms. Sanchez and Mr. Beaman and began to follow Dr. Talley around in an uncomfortable manner. Mr. Anderson attempted to hug Dr. Talley; follow Dr. Talley around

including in the parking lot; and made inappropriate comments toward Dr. Talley such as that he "owns" her computer.

38.     In May 2013, Dr. Talley was assigned to provide training in Kansas City with Mr. Beaman. During this trip, Mr. Beaman spoke over Dr. Talley; did not communicate well with Dr. Talley; and at one point lost his temper and yelled at Dr. Talley to clean up the work.

39.     On May 9, 2013. Dr. Grant harassed Dr. Talley about her work at home and stated that Mr. Beaman had said "nasty things" about Dr. Talley such as that she was "bickering" that Mr. Beaman's not working with other people.

40.     On May 15, 2013, while completing a training in Phoenix Arizona, Dr. Grant interrupted Dr. Talley's training presentation more than 10 times with each of her five presentation sessions in front of a live audience and talked about issues for over five minutes at a time causing a large delay in the training schedule, so much so that Dr. Talley was told to "rush" through her slides in her final presentation. Dr. Talley was also excluded from dinner that evening with members of the staff despite having asked to join them.

41.     On May 22, 2013, Dr. Grant delayed in approving Dr. Talley's request for a doctor's appointment, causing near cancellation of her doctor's appointment.

42.     On June 5, 2013, Dr. Grant asked Dr. Talley to reschedule a biotech meeting for 11:00 a.m. that Friday, despite the fact that Dr. Talley was not scheduled to work and had a doctor's appointment in Boulder. Dr. Grant advised that Dr. Talley could only take a limited number of Fridays off, and Dr. Talley felt intimidated and pressured not to take approved leave. This was despite the fact that Ms. Allely was approved to have all Fridays off.

43.     On June 18, 2013, Dr. Grant designated Dr. Wendy Jin, in his acting position, again passing on Dr. Talley for an opportunity and when Dr. Talley was designated to run the branch when Dr. Grant and Mr. Beaman were not available.

44.     In July 2013, Dr. Talley filed an anonymous OIG complaint regarding Dr. Grant's behavior. Dr. Talley filed the OIG complaint about Dr. Jhee's knowledge of the ongoing affair between her supervisor and the administrative assistant. She complained that Dr. Grant's behavior and inappropriate relations with his two other employees created a hostile work environment. Dr. Talley was later harassed by William Anderson, a friend of Ms. Sanchez.

45.     On September 3, 2013, Mr. Beaman was unable to conduct an administrative position interview for Mr. Anderson and Dr. Talley was pulled out of retirement seminar and was required to sit on the hiring panel. When she asked why Dr. Grant why did not allow her to sit on the committee prior, and he falsely stated that he did not want to "overwhelm" her. Later, on September 5, 2013, Dr. Talley was pressured by Dr. Grant to change her interview score for Mr. Anderson in order to give preference to Mr. Anderson, and later hired Mr. Anderson.

46.     On September 9, 2013, Dr. Grant harassed Dr. Talley via email and communicator because her calendar was alleged to not have been "completely booked" on her work at home day. Dr. Talley later had a conversation with Stacy Scott who advised that Dr. Grant was not an ethical person. Ms. Scott was the PPQ liaison and was also a victim of bullying by Mr. Beaman and Dr. Grant, and Ms. Sanchez.

47.     On September 11, 2013, Dr. Grant harassed Dr. Talley and said that Mr. Beaman was complaining about her conduct. In response, Dr. Talley advised that Mr. Beaman had been unprofessional to her since she mentioned the desk audit on June 11, 2012, which was a suggestion by Ms. Sanchez.

12

48.     On September 17, 2013, Mr. Beaman yelled at Dr. Talley when she was on the phone, and he said he was going to file a formal complaint about her for recording his whereabouts. Dr. Talley called APHIS security and told them about the threats that Mr. Beaman was making against her.

49.     On October 17, 2013. Mr. Beaman arrived and apologized to Dr. Talley and said he used her as a "scapegoat", and it was all "his fault." He refused to answer Dr. Talley's questions regarding his comment.

50.     From June 2012 until the beginning of 2020, Dr. Grant continually denied Dr. Talley's requests to attend paid ESRI GIS training seminars. Dr. Talley submitted these requests for GIS training in her Individual Development Plans ("IDP") through the Agency's "AgLearn" database. Dr. Talley and Dr. Grant also discussed Dr. Talley's request and interest for training at performance reviews and at one-on-one meetings. Dr. Grant would often tell Dr. Talley that they had no funding for the training and asked her to request training at the end of the year when the desired training courses were unavailable. Despite this, Sarah Allely, a coworker of Dr. Talley's, was given the GIS training that Dr. Talley requested but was denied. Dr. Talley brought this concern forward to Dr. Grant and Dr. Grant expressed to Dr. Talley that she was "lucky" to have the job and blamed her for involving others in office drama. Dr. Talley also inquired with ESRI and received email notices when training was available but was not awarded that training until the end of 2019.

51.     In or around 2013 and early 2014, Dr. Grant announced that the branch was expanding and would be hiring new staff and that the branch would be adding a GS-13 Compliance Specialist Position. Dr. Grant encouraged Mr. Beaman and Dr. Talley apply if they were interested. Dr. Talley was excited for the opportunity and repeatedly advised Dr. Grant that she was interested

in applying for the position and that she planned to apply for it. Dr. Jhee was also aware of Dr. Talley's continued interest in applying as the position had come up during conversations between them.

52.     In April 2014, the GS-13 Specialist Compliance position opened on USAJobs. To Dr. Talley's disappointment, the job posting was only open to the Portland, Oregon area and was only open for seven days. Despite this, Dr. Talley was already performing the basic work duties for the GS-13 position and believed she had a competitive chance for the position. In addition, between 2013 and 2015, Dr. Beaman was often vacant from the office and Dr. Talley was required to carry the workload of Dr. Beaman. In April 2014, Dr. Talley again expressed her interest in applying for the GS-13 position to Dr. Grant, despite its location Portland, Oregon, and advised that she would move to Oregon for the promotion. Instead, Dr. Grant requested that Dr. Talley not to apply to the position because he and BRS deputy administrator Mike Firko had someone else in mind to fill the position – Mr. Gary Brown, a PPQ officer located in Portland, Oregon. Dr. Grant told Dr. Talley that there would be other opportunities for her in the future, and that she could not be considered for the Portland GS-13 position because she was not physically located in the Portland commuting area. Dr. Grant discouraged Dr. Talley from applying for the position, and Dr. Talley felt that her current position would be in jeopardy if she applied for the Compliance Specialist position. Since Dr. Grant was likely the selecting official with Dr. Jhee's and Mr. Firko's wanting to hire Mr. Brown, Dr. Talley did not want to challenge them by applying for the position and escalate the harassment she was already experienced in the office that she previously disclosed.

53.     On August 25, 2014, Dr. Grant sent an email announcing that Gary Brown was hired for the Compliance Specialist Position in Portland, Oregon. Mr. Brown was not more qualified than Dr. Talley to be the Compliance Specialist and Mr. Brown's position, GS-13, was

14

not much different than Dr. Talley's position at GS-12. There were no valid reasons for the position being only open in the Portland, Oregon area. At the time, BRS issued around 500 to 800 inspections a year and the number of compliance inspections varied from state to state. The states with the highest number of compliance inspections were in the western United States: Hawaii, Texas, Kansas, Iowa, California, and Nebraska. Oregon had few compliance inspections comparatively, and the drive time to Washington and other nearby states was very long. Mr. Brown only conducted approximately one inspection in Oregon in 2019; approximately three inspections in Oregon in 2018; approximately five inspections in Oregon in 2017; approximately seven inspections in Oregon in 2016; approximately twelve inspections in Oregon in 2015; and approximately one inspection in Oregon in 2014. Before Mr. Brown was hired by BRS, he conducted inspections for Dr. Talley's branch through a MOU with their sister program, PPQ. In 2013, Mr. Brown conducted approximately three inspections for BRS as a PPQ inspector. As far as compliance incidents were concerned, the branch had had several notable incidents that required emergency response: at least two in the state of Washington, one in Montana, and one possibly in Oregon. The branch had compliance agreements in other states including Oregon and Dr. Talley believed that the position was created in Portland, Oregon to hire Mr. Brown and to obstruct Dr. Talley from applying for it. Mr. Brown verbally told Dr. Talley when they travelled together in California that he was pre-selected for the GS-13 Compliance Specialist Position and that he was communicating with Mr. Firko, Dr. Grant, and Dr. Jhee prior to them announcing the position.

54.     On October 9, 2014, Dr. Talley received a performance review which failed to take into account her denied training and all of the training that Dr. Grant requested for her to take in which included the assertiveness training in Houston Texas and Fred Pryor trainings in Fort Collins.

55.     In June 2015, Dr. Grant conducted interviews for the team lead position while Dr. Talley was on vacation, creating a disadvantage for her.

56.     On July 26, 2015, Dr. Talley was promoted to team lead position GS 13 Step 3. Mr. Brown on the hiring committee, however, said that he wanted to give the job to Ms. Allely because she was "younger", and Dr. Grant "favored" her. Dr. Talley was also told by Dr. Grant not to apply for the senior regional biotechnologist position because he planned on giving that to Ms. Allely. As a result, Dr. Talley did not attempt to apply for the position because she was intimidated by Dr. Grant.

57.     On October 31, 2016, Dr. Talley received a performance review, but only received one point for teamwork because the team lead on the East Coast, Kira Metz, young, white female, had allegedly made a false complaint about her to her friend and supervisor, Ms. Bertone, which was unsubstantiated. Dr. Talley later spoke with Ms. Metz, who denied any wrongdoing on Dr. Talley's part, and denied any complaint.

58.     In April 2017, Dr. Talley was promoted to temporary Acton Branch Chief, while Dr. Grant was on paternity leave. This was, however, after Mr. Brown was offered the position first and turned it down and after Ms. Allely turned down the position due to qualification issues. Dr. Grant also wrote desired conferences out of Dr. Talley's acting position so that Ms. Allely had the opportunity to attend instead.

59.     In April 2018, Dr. Talley was accused by Dr. Gant of conspiring against him and acused of telling others to file a grievance at the end of year concerning their performance reviews. Dr. Grant yelled profanities at Dr. Talley in front of Dr. Jhee, who was on teleconference, and told Dr. Talley that she was the reason for Mr. Beaman leaving. Dr. Grant also false stated that Dr.

Talley made Ms. Allely uncomfortable because of the way that Dr. Talley treated Mr. Beaman. Dr. Talley's performance plan was then changed without her input.

60.     On October 17, 2018, Dr. Talley received a performance rating with issues in mission result and collaboration teamwork despite the fact that Dr. Talley had an outstanding gear in Mission results including developing a proposal for a pilot project that looked at satellite images for compliance related; a highly successful pilot project which proved to enhance compliance oversight in a unique way.

61.     In June-July 2019, Dr. Talley expressed continued interest in applying for the Acting Western Compliance Branch Chief ("WCBC"), the GS- 14, and informed Dr. Grant and Dr. Jhee of her interest.

62.     On June 5, 2019, Dr. Talley sent an email to Dr. Grant reiterating that she was interested in the acting position when Dr. Grant went to Riverdale, Maryland to take the acting Communications Branch Chief Position in July 2019. Dr. Grant said that Dr. Jhee would be the selecting official and Dr. Talley reached out to Dr. Jhee by phone.

63.     In July 2019, despite Dr. Talley's continued expressed interest, the GS-14 Acting WCBC position was never announced for competition and was later given to Mr. Brown out of the Portland, Oregon office. Mr. Brown was Dr. Talley's acting branch chief and discussed his temporary promotion with Dr. Talley. Mr. Brown told Dr. Talley that she should not complain about not being able to compete for the position and said that Dr. Jhee called him and offered the position to him and because he wanted to retire at end of 2019 and that he "could use the extra money." Mr. Brown also told Dr. Talley that his first attempt with his resume failed, and that Dr. Talley needed to correct her own resume and send her a copy of his new resume. Mr. Brown further said that Dr. Talley was "lucky" to get the acting temporary position in 2017 when Dr. Grant went on paternity

leave in 2017. Mr. Brown also told Dr. Talley that she received the less than 30-day promotion because he had initially turned it down and that Ms. Allely was going to Alaska for State Plant Health Directors meeting and a cruise and also passed on the opportunity before it was offered to Dr. Talley.

64.     On October 25, 2019, Dr. Talley received a performance rating by Dr. Grant with issues in mission results and professional relationship, despite the fact that Dr. Talley, was incident commander in the field two times in May and June 2019 she did an outstanding job. She also ran a successful pilot project that showed the satellite imagery can be used for compliance oversight.

65.     In or around November 2019, Dr. Wall was on a temporary detail promotion as an inspector GS 12. During his detail, Dr. Wall made inappropriate comments toward Dr. Talley, telling her that she must resign; that she needed "to find a husband to take care of [her]"; and that Dr Grant was going to force her out and not to "fight it."

66.     On or around December 11, 2019, Dr. Talley noticed a lack of support from RFP management for her satellite project. For example, Dr. Grant would not support Dr. Talley, but he allowed Ms. Alfano to present about Dr. Talley's meeting and project to ROP management instead of Dr. Talley as a team lead.

67.     On or around February 25, 2020, Dr. Grant demanded information on Dr. Talley's satellite imagery project for the Washington incident and was harassed Dr. Talley about coming into the office for a random drug test.

68.     On March 12, 2020, Ms. Sanchez came to Dr. Talley's cubicle and again asked if she was interested in dating Dr. Grant.  Dr. Talley was intimidated by her questions because she knew that Ms. Sanchez was having a romantic relationship with Dr. Grant.

69.     In March 2020, Dr. Grant and Dr. Jhee reassigned a small pilot project that Dr. Talley created, led, and worked on throughout 2019 to Heather Brown. Ms. Brown held a Kickoff Meeting and called Dr. Talley prior to the meeting to apologize that Dr. Grant and her supervisor, Nathaniel Yates, had made her the new team leader of the pilot project; that the project was being renamed turning it into the Compliance Oversight Project; and that Dr. Talley would no longer be the team leader. Ms. Brown expressed her apologies to Dr. Talley and said that it was out of her control and admitted it was not fair to Dr. Talley. Christana Gouin, another coworker, was also on the project and observed the reassignment. Ms. Gouin and Dr. Talley later discussed the reassignment a few times as retaliation from Dr. Talley's whistleblowing as it was well known that Dr. Grant was trying to punish Dr. Talley. There was no prior notice of the reassignment by Dr. Grant, and Dr. Jhee left BRS for another position. Dr. Talley only learned about the reassignment through Ms. Brown's phone call prior to the meeting.

70.     Despite being assigned to Dr. Talley's pilot project of satellite imagery, Ms. Brown was not able to contribute much to the project, and in 2020, and with very last-minute end-of-year funds, Dr. Talley was able to secure the satellite contracts herself for the project's continuation. Ms. Brown did not contribute much to the project until Mr. Mason requested work from the team. When Dr. Talley asked Ms. Brown for help, Ms. Brown accused her of trying to use up the funds in the contract.

71.     From June 8, through August 1, 2020, Dr. Talley served as Acting WCAB Branch Chief and her duties and accomplishments included mitigating unforeseen inspection challenges such as travel restrictions during the COVID-19 pandemic; updating inspection worksheets; preparing for in person inspections in case of travel; engaging CEEB and PPQ to help with workload; identifying timely follow-up inspections; and clustered inspections with the same

cooperator to increase efficiency. As a result of Dr. Talley's efforts, ROP met inspection and compliance goals. Dr. Talley was also tasked to find the best satellite imagery solutions to meet ROP needs and assessed primary and third-party satellite imagery vendors, developed a creative solution, created contract criteria, and secured contracts with two imagery providers. On her own initiative, Dr. Talley directed two RAs to preserve their unique knowledge by creating a shared folder for them to document how they conducted facility and equipment inspections. Dr. Talley also led the development of a field inspection Health and Safety document and provided links to the latest guidance from Centers for Disease Control and Prevention ("CDC").

72.     Despite Dr. Talley's duties and accomplishments, Dr. Talley did not receive a salary increase nor was she issued a SF50 for a temporary promotion to acting WCAB Branch Chief. An increase in salary has a substantial financial impact on a federal employee's retirement and when an award is given in lieu of the salary increase; the award is not taken into consideration. Dr. Grant awarded Philip Mason multiple temporary Branch chief positions, while denying the same opportunities to Dr. Talley, and this gave Dr. Mason an advantage over Dr. Talley when applying for the permanent position.

73.     After she was not selected for the WCAB Branch Chief position, Dr. Talley filed a timely EEO complaint but received no relief from her team lead duties as a GS-13 and did both positions very well. Dr. Talley believed that she successfully accomplished more than anyone else appointed to the position in her 60-day appointment.

74.     In August 2020, Dr. Talley filed another a OIG complaint against fraud waste and abuse in the workplace.

75.     On October 29, 2020, Dr. Talley received a performance rating from Dr. Grant which failed to take into account her role as a team lead in the PPQ processing group and her exceptional job in leadership.

76.     On January 25, 2021, Dr. Philip Mason provided Dr. Talley with a late change in her performance plan making it almost impossible for Dr. Talley to keep her job. She was not invited to participate in the development of this performance plan.

77.     Due to Dr. Talley's several aforementioned medical conditions (further heightened by the workplace discrimination; disparate treatment; and hostile work environment she experienced), Dr. Talley began making requests for reasonable accommodation in May 2016. At the time, she was unsure if her condition was permanent, and  an accommodation, she was given a lightweight computer with touchscreen. Dr. Talley made a formal request to the Agency for reasonable accommodation in July 2018. In 2018, the office worked a maxiflex schedule and Dr. Talley was informed that she could telework three days a week and work in the office two days a week. Dr. Talley was discouraged from taking Fridays off, despite the fact that a longer weekend helped her recover and commuting to the office caused her intense pain. Dr. Talley was the only staff member in the office on Friday, and it did not make sense to require her to be physically present in the office. Dr. Talley was also denied permanent telework status while several other employees without reasonable accommodation were granted permanent telework status.

78.     In January 2021, Dr. Talley requested a reasonable accommodation request with her supervisor, Philip Mason. Mr. Mason issued his decision on her reasonable accommodation request on February 28, 2021, and did not grant her primary requested accommodation to be placed on permanent telework status. Mr. Mason instead said he would revisit the reasonable accommodation request when the Agency ordered the staff back into the office on October 1, 2021. Permanent

telework would have required an official change of duty station which he denied. Dr. Talley took disability retirement in 2022 because she felt that she was being squeezed out of her job by the Agency changing her performance plan and requiring that she have more sedentary and undesirable work; leaving her out of mandatory meetings by leaving her off the meeting notices and invites; and changing her performance plan.

79.     Dr. Talley requested an accommodation and USDA denied her request for the accommodation and failed to make the accommodation. When USDA employees were required to return to the office on October 1, 2021, the Agency continued to deny Dr. Talley's requested accommodation.  At the time her request for accommodation was denied, she was not told that it was placed on hold due to the COVID-19 pandemic.

80.     Dr. Talley filed a formal EEO complaint on May 10, 2021, alleging discrimination based on sex, age, disability, reprisal, parental status, and gender identity.  In a Partial Acceptance Letter dated July 2, 2021, Dr. Talley was advised that certain issues raised in her Formal Complaint were being dismissed because Dr. Talley had raised them in her Individual Right of Action Appeal filed with the MSPB on April 14, 2021.  These issues included the following:

B.   on or around August 1, 2020, she learned that management failed to issue her a U.S. Personnel Management Standard Form 50 (SF-50) for her temporary promotion as Western Compliance Branch Chief (GS-14), from June 8, 2020 to August 1, 2020, subsequently affecting her differential salary pay raise;

C.   on unspecified dates beginning in June 2012 and continuing to the beginning of 2020, management denied her requests to attend funded training seminars, or granted training approval too late, subsequently preventing the Complainant from attending the training(s); and

D.   on several dates, she was subjected to various incidents of harassment, including but not limited to,

1.   on unspecified dates beginning in June 2012 and continuing to the beginning of 2020, her supervisor:

a)   ignored her concerns that she wasn't provided the same work opportunities and experience that her younger male colleagues were provided;

. . .

g) was not attentive during her performance evaluation review(s), sometimes sitting with his back to her while he worked on his computer; and

h) made himself readily available to other staff members in the office, but never to her.

2.   on or around June 15, 2012, her supervisor ignored her concerns about continuous harassment directed toward her (Complainant) from her colleague, and angrily  denied the substance of her allegations;

3.   on or around August 2014, after informing management she was interested in obtaining  a GS-13 Compliance Specialist/Biological Scientist position, her supervisor informed her that he had someone else in mind for the position, and that he should not apply.

81.   Dr. Talley was advised in the Partial Acceptance Letter that dismissed claims may be used as background information during the investigation of the accepted claims and that the Agency's determination that the cited issues should be dismissed would be reviewed by an U.S. Equal Employment Opportunity Commission ("EEOC") Administrative Judge ("AJ") if a hearing is requested on the remainder of the subject EEO Complaint.

82.     Dr. Talley filed an IRA Appeal with the MSPB on April 14, 2021, and the MSPB ruled in favor of the Agency, and Dr. Talley was never given an opportunity to request that her dismissed claims be reinstated by an EEOC AJ.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e** *et seq.*
*Sex Discrimination, Hostile Work Environment, Disparate Treatment*

84.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

85.     At all pertinent times, Defendant was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

86.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

87.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to er compensation, term, conditions, or privileges of employment, because of such individual's color, religion, sex, age, national origin, or to limit, segregate, or classify employees or applicants for employment opportunities or otherwise adversely affect her status as an employee, because of the individual's race, color, religion, sex, age, or national origin

88.     Defendant, in violation of Title VII of the Civil Rights Act of 1964, subjected Plaintiff to discrimination based on her sex by creating a hostile work environment and subjecting her to disparate treatment. Plaintiff's supervisor in 2012, Douglas Grant, subjected Plaintiff Talley to a hostile work environment and disparate treatment by offering preferential work assignments to Jeffrey Beaman; allowing Beaman to threaten to kill Plaintiff without consequences; allowing

24

Dasha Sanchez to harass Plaintiff about whether she was interested romantically in Douglas Grant; blaming Plaintiff for conflict in the office; denying training to Plaintiff; yelling at her and including false information on her performance review in 2017 and 2018; denying selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions; failing to provide Plaintiff with a salary increase when she was a given a temporary promotion to Acting WCAB Branch Chief and update Plaintiff's SF 50 to reflect a promotion detail; denying Plaintiff's request for reasonable accommodation in 2021 and failing to advise Plaintiff of her FMLA rights in February 2021. Plaintiff was treated differently than her male colleagues, including Jeffrey Beaman and Gary Brown. The reasons given for Plaintiff's non selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions are false and the Agency did not follow its normal policies in filling the vacancies. The harassment against Dr. Talley was unwelcome, based on her gender, sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere and there is a basis for imposing liability on the employer. Dr. Talley reported that Mr. Beaman accused her of playing the woman card and threatened to kill her.  Dr. Talley objectively feared working in the office with Mr. Beaman and no action was taken to address her concerns. Further, there was a marked change in how Dr. Talley was treated when she reported that her supervisor, Dr. Grant was engaged in a romantic relationship with his secretary, Ms. Sanchez, and after she reported that Mr. Beaman threatened to kill her.  The retaliatory hostile work environment against Dr. Talley began after she reported to romantic relationship between her supervisor and his secretary and after she reported the threat on her life by her coworker, Mr. Beaman.  The harassment and retaliation occurred each year from 2012 through 2022.

89.     As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress, pain and suffering, humiliation, and embarrassment.

90.     Defendant had no legitimate business reason for any such acts.

91.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

**COUNT II**
**Violation of Section 501 of the Rehabilitation Act of 1973**
**29 U.S.C. § 791**

92.     Plaintiff realleges and incorporates by reference each of the allegations in the paragraphs above as if set forth fully herein.

93.     At all pertinent times, Defendant Vilsack, in his official capacity as the Secretary of the USDA, was an employer under and subject to provisions of the Rehabilitation Act of 1973, 29 U.S.C. § 791.

94.     At all pertinent times, Plaintiff was an employee entitled to protection under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791.

95.     Section 501 of the Rehabilitation Act prohibits federal executive branch agencies from discriminating against qualified individuals with disabilities and requires executive branch agencies to take affirmative action in the hiring, placing, and advancing of individuals with disabilities, and requires interpretation consistent with the Americans with Disabilities Act. 29 C.F.R. § 1630.9(a) makes it unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability unless such covered entity can demonstrate that the accommodation would impose an

undue hardship on the operation of its business. 29 C.F.R. § 1614.203(c) further requires that the federal government be a "model employer" of individuals with disabilities.

96.     Defendant USDA has engaged in illegal disability discrimination, as defined by the Rehabilitation Act failing to provide reasonable accommodation for Dr. Talley's disability by allowing her permanent telework, delaying approval of her requests for medical leave, and requiring her to come into the office on Friday.

97.     Defendant had no legitimate business reason for any such acts. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory and/or retaliatory practices that are not yet fully known.

**COUNT III**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e *et seq.***
***Retaliation***

98.     Plaintiff incorporates by reference paragraphs 1 through 42 as if fully stated herein.

99.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual filed a complaint of discrimination.

100.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

101.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

102.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to retaliation and created a hostile work

environment because she filed complaints of discrimination beginning in June 2012. The retaliation included, blaming Plaintiff for conflict in the office; denying training to Plaintiff; yelling at Plaintiff and including false information on her performance review in 2017 and 2018; denying selection for the Acting Western Compliance Branch Chief and Compliance Specialist positions; failing to provide Plaintiff with a salary increase when she was a given a temporary promotion to Acting WCAB Branch Chief and update Plaintiff's SF 50 to reflect a promotion detail; denying Plaintiff's request for reasonable accommodation in 2021 and failing to advise Plaintiff of her FMLA rights in February 2021. Plaintiff was treated differently than her colleagues who had not engaged in protected activity. Further, there was a marked change in how Dr. Talley was treated when she reported that her supervisor, Dr. Grant was engaged in a romantic relationship with his secretary, Ms. Sanchez, and after she reported that Mr. Beaman threatened to kill her. The retaliatory hostile work environment against Dr. Talley began after she reported to romantic relationship between her supervisor and his secretary and after she reported the threat on her life by her coworker, Mr. Beaman. The harassment and retaliation occurred each year from 2012 through 2022.

### COUNT IV
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 633a**
*Age Discrimination*

103.     Plaintiff incorporates by reference paragraphs 1 through 36 as if fully stated herein.

104.     The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age.

105.     At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

106.    At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

107.    In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to discrimination and created a hostile work environment because of her age. Dr. Talley was targeted because of her age by her supervisor, Douglas Grant. Two of Plaintiff's female coworkers were considerably younger than Plaintiff and they received almost all of the opportunities for promotions, training, education and assignments on committees. One of younger female co-workers was Sarah Alley and she received multiple promotions, awards and career enhancing assignments. Dr. Grant demonstrated his preference for working with the younger female employees over Dr. Talley. He made demeaning comments to Dr. Talley during meetings, and when he met with her, he would constantly be preoccupied with instant messaging and would turn his back to her, but gave his full attention to the younger female employees when he interacted with them. Comments about Dr. Grant preference for younger employees were also made to Dr. Talley.

108.    As a result of such acts, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Talley prays as follows:

A.    That the Court issue an order declaring Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. § 791, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a and declaring Plaintiff eligible to receive equitable and other relief;

B.    That the Court enter judgment against Defendant and award damages no less than $5,000,000 (five million dollars);

C.      That the Court issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.      That the Court enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law;

E.      That the Court order Defendant to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.      That the Court order Defendant, individually and collectively, to pay compensatory damages;

G.      That the Court order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees, and costs; and

H.      That the Court order Defendant to pay pre-judgment and post-judgment interest as provided by law.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

Date: October 23, 2023                                Respectfully submitted,

                                                                */s/ David A. Branch*
                                                                David A. Branch, Esq.
                                                                #22862
                                                                Law Office of David A. Branch
                                                                & Associates, PLLC
                                                                1828 L Street N.W., Suite 820
                                                                Washington, D.C. 20036
                                                                Phone: (202) 785-2805
                                                                Fax: (202) 785-0289
                                                                Email: davidbranch@dbranchlaw.com